IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Gregory Schuring and Mary Schuring, | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 13 C 7142 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| Cottrell, Inc. and Casses Corporation, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gregory Schuring and his spouse, Mary Schuring, brought this action against Defendant Cottrell, Inc.[1] after Gregory sustained injuries in a fall from a Cottrell-manufactured trucking rig during the course of his work as a truck driver hauling cars. Plaintiffs filed state claims in Illinois against Cottrell, and Cottrell removed the state action to this Court pursuant to diversity jurisdiction. (Dkt. 2.) Gregory Schuring seeks damages for strict product liability (Count I), product negligence (Count II), implied warranty (Count III), and willful and wanton conduct (Count IV), while Mary Schuring seeks to remedy her loss of consortium (Count XIII). Cottrell moves this Court to bar Plaintiffs' expert, Clarke Gernon, from testifying about the unreasonable danger posed by the design of Cottrell's trucking rig [97] and moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. [94] For the following reasons, the Court denies both motions.

---

[1] Plaintiffs also brought this action against Cassens Corporation, which remains a party to this suit but does not present motions contemplated by this Order. The parties do not dispute that the Schurings and Cassens Corporation have reached a resolution of this claim. (Dkt. 107, ¶ 3.)

## BACKGROUND

The parties do not dispute the below facts unless otherwise noted.

On September 3, 2011, Plaintiff Gregory Schuring ("Schuring") was working as a car hauler for Cassens Transport Company, Inc., delivering automobiles to dealerships in Illinois. (Dkt. 107, Plaintiffs' Response to Defendant Cottrell's LR 56.1 Statement of Material Facts, ¶¶ 1, 3, 5-6.) He drove a rig made by Defendant Cottrell, Inc. ("Cottrell"), which designs, manufactures, and sells automobile transport trailers. (*Id.*, ¶¶ 2, 6.) At his last stop of the day, he went to unload two Nissan Jukes. (*Id.*, ¶ 5.) Both vehicles sat on the upper deck of the rig – one in the "No. 6" position, towards the front of the truck over its cab, and the other in the "No. 8" position, towards the rear. (*Id.*, ¶ 7; Dkt. 109, Cottrell's Response and Objections to Plaintiffs' Statement of Additional Facts, ¶ 2.) Schuring climbed to the upper deck, still elevated, and tried to walk from the No. 6 position in the front to the No. 8 position in the rear.[2] (Dkt. 107, ¶¶ 6, 11; Dkt. 105-2, Schuring Dep., at 152, 149:5-21.) In doing so, Schuring crossed over the middle position, No. 10. (Dkt. 107, ¶ 11; Dkt. 109, ¶ 2.) He gripped the bar adjacent to position No. 10 and attempted to step with his right foot onto a narrow steel beam that served as the outer rail of position No. 8.[3] (Dkt. 109, ¶¶ 6-7; Dkt. 105-2, at 15, 6:3-7.)[4] His right foot slipped on a

---

[2] The parties dispute whether Schuring "chose" to walk between these two positions, or whether he needed to do so based on the design of the trucking rig. (*See* Dkt. 107, ¶ 11.)

[3] Cottrell disputes Plaintiffs' assertion that Schuring "gripped the grab bar adjacent to [the No. 10] position" because Schuring does not use the term "grab bar" in his deposition. (Dkt. 109, ¶ 6; Dkt. 105-2, at 156:3-7.) Schuring demurs the use of the term he employs: "My right hand was on that No. 10, the third, whatever you want to refer to, handrail…" (Dkt. 105-2, at 156:3-4.) The parties and record do not give the Court reason to believe that the different terms refer to different components of the truck, so the Court construes Schuring's statement, whether a handrail or grab-bar, as undisputedly referring to the same part of the truck.

[4] In its response to Plaintiffs' additional facts that rely in whole or in part on photographs submitted by proffered expert Clarke Gernon, Cottrell objects to the admissibility and consideration of the photographs, stating that they are exhibits to Gernon's unsworn Rule 26 Report that should be considered hearsay under *Estate of Brown v. Thomas*, 771 F.3d 1001, 1005-06 (7th Cir. 2014) (where expert report "filed with the district court … could not be admitted into evidence without an affidavit attesting to its truthfulness" based on Federal Rule of Civil Procedure 56(e)(3) and Federal Rule of Evidence 901(a)). (*See e.g.*, Dkt. 109, ¶¶ 6-7.) The parties in *Estate of Brown* also failed to depose proffered expert William Gault, so the absent affidavit in that case proved fatal to the expert report's admissibility without another means by which Gault could attest to the truthfulness of his statements. *See Estate of Brown v.*

substance thought to be hydraulic fluid and wedged between the deck's outer rail and its "flipper," a metal hinge used to bridge positions No. 8, 10, and 6 so that vehicles drive on the upper deck. (Dkt. 107, ¶¶ 13, 15; Dkt. 109, ¶ 8; Dkt. 105-7, Gernon Dep., at 36, 139:4-140:25.)

With his foot stuck, Schuring fell backwards and hung upside down. (Dkt. 107, ¶ 16.) Dangling, he called for help. (*Id.*, ¶ 17.) No help came. (*Id.*, ¶ 17.) Schuring could feel pain in his right foot and leg. (Dkt. 109, ¶ 10.) With no help on the way, Schuring hooked his left foot around the base of the grab-bar at position No. 10 in order to free his foot and himself.[5] (Dkt. 107, ¶ 17; Dkt. 109, ¶ 10.) Schuring successfully unhooked his right foot, but when he did, he fell to the ground and landed on his left buttocks. (Dkt. 109, ¶¶ 10, 11; Dkt. 105-2, at 166, 163:2-164:9; 175-181, 172:21-178:5.)

Back in 2009, Cottrell had retrofitted the head ramp with a strap system after two fatal incidents prompted the company to provide additional materials to protect the safety of their customers. (Dkt. 107, ¶ 6; Dkt. 109, ¶ 1; Dkt. 105-8, Hanks Dep., at 6, 15: 7-21; Dkt. 105-4, Howes Dep., at 10-11, 32:14-36:23.) This retrofitting included the addition of two cables strung by posts in position No. 6 in order to protect drivers from falling off the upper deck. (Dkt. 109, ¶ 3.) No such cable guardrails flanked positions No. 10 or 8, where Schuring slipped. (*Id.*, ¶ 5.) A catwalk attached in the middle of the outer rail of position No. 8, which provided a wider surface area for drivers walking or standing on the upper deck while loading or unloading cars. (*Id.*, ¶ 12.) No such catwalk existed where Schuring's foot slipped off the rail. (*Id.*, ¶ 13.) According to Schuring, he has seen a couple of car hauler rigs that have posts and cable guard

---

*Thomas*, 771 F.3d at 1006. Here, Gernon attests in his deposition to the authenticity of the photographs of the original Cottrell rig and the Sure Footing system, so he does not face the same challenge, and Plaintiffs' facts based on these can be admitted. (*See* Dkt. 105-7, at 5, 13:2-30; 14:5-10; at 6, 22:8-13; 23:23-24:14; *see also*, Dkt. 105-1; Dkt. 105-10.) Cottrell also objects to the use of video surveillance for the same reason, but neither motion turns on the use of the only paragraph in the Plaintiffs' Supplement Statement of Facts that cites to this evidence, so the Court need not resolve its admissibility at this time. (*See* Dkt. 109, ¶ 20.)

[5] The parties also dispute whether Schuring "chose" to fall because he contemplated and executed the decision to use his left foot to free his right foot. (Dkt. 107, ¶ 17.)

rails installed in the position No. 8 area where he fell. (*Id.*, ¶ 16; Dkt. 105-2, at 51, 51:7-52:14.) The rail itself had been coated with non-skid paint, making it a surface that Cottrell's user manual and warning labels advised drivers to use when climbing up or down the head ramp or generally moving about the rig. (*Id.*, ¶ 14.) The user manual also warned that drivers should check for any fluids, debris or other contaminants on the decks and, if found, clean any residue before proceeding. (Dkt. 105-2, Cottrell Operator's Manual for Car-Hauling Equipment, at 394.)

Schuring and his spouse, Mary, filed this Complaint in Illinois state court, alleging that design flaws in the trucking rig, including inadequate catwalks and grab-bars, led to Schuring's fall. (Dkt. 2-2, at 4; Dkt. 107, ¶ 1.) The Plaintiffs seek actual, compensatory, and punitive damages. (*See* Dkt. 2-2, at 5-7, 9, 24.) To prove these defects, Plaintiffs offer the testimony of their expert, Clarke J. Gernon, Sr. (Dkt. 105-7, Gernon Dep.; Dkt. 105-6, Gernon Findings; Dkt. 105-9, Gernon Resume.) Gernon has forty-eight years of experience as a mechanical engineer, working on projects in the automotive, aerospace, and aircraft industries, among others. (Dkt. 105-9, at 1.) He has provided expert testimony in cases related to accidents involving automobiles, forklifts, tractors, and heavy machinery. (*Id.*, at 3-16.) For Schuring's case, along with his respective personal observations and inspections of the truck and alternative design in question, Gernon reviewed patents, federal regulations, photographs, deposition transcripts, and documents produced by Defendants. (Dkt. 105-6, at 3-8.) He offers five opinions on what he deems unreasonably dangerous aspects of the design and manufacture of Cottrell's trucking rig, namely insufficient catwalks, grab-bars, movable safety platforms, and an overall design that requires drivers to make multiple trips to the head ramp in order to comply with Cottrell's unloading procedure. (*Id.*, at 3-6.)

On October 4, 2013, Cottrell removed the action to this Court pursuant to diversity jurisdiction. (Dkt. 2, at 1.) Cottrell now moves to bar Gernon as an expert and, regardless of whether the Court considers Gernon's testimony, moves for summary judgment against the Schurings. (Dkt. 94; Dkt. 97.)

## **DISCUSSION**

In Counts I-IV, Gregory Schuring seeks damages for strict liability, negligence, implied warranty, and willful and wanton conduct, respectively. (Dkt. 2-2, at 3-9.) His spouse, Mary Schuring, seeks to remedy her loss of consortium in Count XIII. (*Id.*, at 24.) Cottrell moves to bar Plaintiffs' expert, Gernon, by arguing that Gernon fails to meet any of the criteria required for an expert to testify. (Dkt. 98, at 3.) Cottrell further moves for summary judgment on the grounds that the record, even with Gernon's testimony, cannot show that the design and manufacture of Cottrell's trucking rig proximately caused Schuring's injury. (Dkt. 95, at 1-2.)

## I. Motion to Bar Plaintiffs' Expert, Clarke Gernon

### A. Legal Standard

The Court first turns to Cottrell's Motion to Bar Plaintiffs' Expert. "The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009) (citing *Naeem v. McKesson Drug Co.,* 444 F.3d 593, 607 (7th Cir. 2006)). Rule 702 charges trial judges with acting as "gatekeeper[s] with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch,* 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, (1999)). "The purpose of [the *Daubert* ] inquiry is to vet the proposed testimony under Rule 702's

requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 804 (7th Cir. 2012) (quoting Fed. R. Evid. 702).

In evaluating whether an expert's proposed testimony meets the *Daubert* standard, the Court "scrutinize[s] the proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley,* 689 F.3d at 805 (quoting *Kumho Tire,* 526 U.S. at 152). Whether to admit expert testimony rests within the discretion of the district court. *See id.,* 689 F.3d at 810 ("[W]e 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.'") (quoting *Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 894 (7th Cir. 2011)). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis,* 561 F.3d at 705; *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified...."); Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

Courts apply the *Daubert* framework to Rule 702 using a three-part analysis. *Myers v. Ill. Cent. R.R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010). First, the Court must determine whether knowledge, skill, experience, training, or education qualify the proposed witness as an expert. If so, the Court must decide whether the reasoning or methodology underlying the expert's testimony is reliable. If the proposed expert meets both requirements, the Court must assess whether the expert's proposed testimony will assist the trier of fact in understanding the evidence or determining a factual issue. *See* Fed. R. Evid. 702; *Myers,* 629 F.3d at 644 (citing *Ervin v.*

*Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007)); *see also Ortiz v. City of Chicago,* 656 F.3d 523, 526 (7th Cir. 2011). The Court only addresses those opinions brought to the Court's attention and will not separately probe to issue *sua sponte* determinations regarding the admissibility of each statement. *See, e.g., Goldberg v. 401 North Wabash Venture LLC,* No. 09 C 6455, 2013 WL 212912, at *1 n.1 (N.D.Ill. Jan. 18, 2013).

### B. *Daubert* analysis

### 1. Qualifications

Cottrell first argues that Gernon does not qualify to give the opinions he offers because his expertise does not prepare him to speak on the matters at issue in this case. Gernon testified that he does not hold himself out as an expert with regards to the "automobile transport industry" or the "design and manufacture of automobile transport trailers." (Dkt. 98, at 5; Dkt. 105-7, at 55, 216:18-217.) Asked if he held himself out as a "fall protection or prevention expert," Gernon replied, "Not particularly." (Dkt. 98, at 5; Dkt. 105-7, at 26, 100:21-23.) He also confirmed that he had never worked for a car hauler designer, hauled cars, consulted for a car hauling company, designed any part of any automobile transport trailer, nor consulted with anyone regarding the design of such a trailer. (Dkt. 98, at 5; Dkt. 105-7, at 121:17-122:15.) He never witnessed the model of this Cottrell rig in operation. (Dkt. 98, at 5; Dkt. 105-7, at 75, 4:24.) Moreover, he could not speak to specifics about the federal regulations restricting truck dimensions or drivers' union agreements. (Dkt. 98, at 5: Dkt. 105-7, at 212:18-214:21; 215:14-216:17.)

While Gernon's answers affect the weight of his credibility, Cottrell mischaracterizes the *Daubert* inquiry. Courts do not necessarily require an expert witness to possess specialized expertise with an industry or product. Rather, courts ask whether his qualifications "provide a foundation for [him] to answer a specific question." *See Gayton v. McCoy*, 593 F.3d 610, 617

(7th Cir. 2010) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994)); *see e.g.*, *Lott v. ITW Food Equip. Grp. LLC*, No. 10 CV 1686, 2013 WL 3728581, at *6, 14 (N.D. Ill. July 15, 2013) (holding that mechanical engineer proffered as expert witness need not have experience engineering the particular piece of equipment at issue). For example, courts often find generalist physicians competent to testify about medical problems typically treated by specialists if the opinion does not require specialized knowledge. *See Gayton*, 593 F.3d at 617 (citations omitted). A doctor who is not a cardiologist or pharmacist may testify that a combination of medications and symptoms contributed to a plaintiff's death where the effects of resulting vomiting are not specialized knowledge, but she may not qualify to testify that a particular medication would have prevented the death. *See id.* An expert witness does not even have to offer "scientific" testimony as long as it is within his competence. *See Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (citations omitted).

The parties do not dispute Gernon's expertise as a forensic mechanical engineer. He holds a graduate degree in mechanical engineering and has managed or engineered such projects for forty-eight years. (*See* Dkt. 105-9, at 1.) Gernon's experience includes mechanical puzzles of far greater complexity than safety mechanisms for trucking rigs, such as converting a chemical and biological weapons production facility into a center for cancer research and designing devices to test the engines of tanks and helicopters used in Operation Desert Storm. (*See id.*, at 1.) Nothing in the record suggests, and Cottrell does not argue, that fall protection design for trucking rigs is so specialized that someone with Gernon's mechanical engineering background would not qualify to opine on the issue. (*See id.*, at 1.)

Of course, a mechanical engineer does not necessarily qualify to speak to all product design questions. *See Gayton*, 593 F.3d at 617. Cottrell points to cases where proposed

witnesses did not qualify as experts without more particularized backgrounds. *See e.g.*, *Padilla v. Hunter Douglas Window Coverings, Inc.*, 14 F.Supp.3d 1127, 1131-32 (N.D. Ill. 2014); *Moore v. P & G-Clairol, Inc.,* 781 F. Supp. 2d 694, 704 (N.D. Ill. 2011); *Edwards v. Permobil, Inc.*, No. 11-CV-1900-SSV-DEK, Dkt. 208 (E.D. La. Aug. 21, 2013). Yet none of these cases directly apply. *Padilla* struck an expert witness who "admitted during his deposition that he has no practical experience or training in the field of window blind design…" *See e.g.*, *Padilla*, 14 F.Supp.3d at 1132. But in that case, unlike here, the proffered witness based his expertise on his tenure as Commissioner on the United States Consumer Production Safety Commission without any training as an engineer, which he conceded would be necessary for him to understand how window blinds open and close. *See e.g.*, *Padilla*, 14 F.Supp.3d at 1131-32. Similarly, in *Moore v. P & G-Clairol* and *Edwards*, the mechanical engineers proffered as experts – including Gernon himself in the latter – did not possess the specialized psychological expertise to qualify to speak on whether product instructions or warning labels would properly caution users against their misuse. *See e.g.*, *Moore v. P & G-Clairol, Inc.,* 781 F. Supp. 2d at 704; *Edwards*, No. 11-CV-1900-SSV-DEK. But Gernon does not opine on any warning labels or instructions that drivers would need to interpret. (*See* Dkt. 105-6, at 3-6.)

Gernon's testimony more closely resembles that of the expert offered in *Lott*, who qualified to testify even without experience specific to the waste disposal system at issue. *See e.g.*, *Lott*, 2013 WL 3728581 at *14. More on point, Gernon's qualifications and testimony mirror that of Dr. Gerald Micklow in *Hasan v. Cottrell, Inc.,* whose mechanical engineering expertise qualified him to opine about the fall protection design on a *Cottrell* trucking rig because such questions do not require "such a highly specialized analysis" that a general background would not sufficiently prepare an expert witness to answer the questions asked on

such design.  *See e.g.*, *Hasan v. Cottrell, Inc.,* No. 10 C 5534, 2014 WL 4124254, at *3 (N.D.Ill. Aug. 21, 2014).  Gernon's lack of specialization may affect the weight of his opinions, but does not preclude their admissibility.  *See e.g.*, *Lott*, 2013 WL 3728581 at *14 (citing *Loeffel Steel Prods., Inc.*, 372 F.Supp.2d 1104, 1113 (N.D.Ill. 2005)).  Far from disqualifying him, the Court finds that the breadth and depth of Gernon's mechanical design expertise will sufficiently prepare him to analyze the feasibility and utility of the various safety mechanisms at issue in the design of this *Cottrell* trucking rig.  *See Gayton*, 593 F.3d at 617.  For these reasons, the Court finds Gernon's expert qualifications sufficient for the opinions he offers.

### 2. Reliability of Methodology

Cottrell next argues that Gernon does not employ a reliable methodology for discerning the opinions he offers, given that he does not test any alternative design to support his opinions about the unreasonable danger imposed by the rig as designed.  (Dkt. 98, at 8-9.)  Gernon admits that he did not test his theories about a grab-bar or the Sure Footing mechanism, two of the safety features about which he opines in his report.  (Dkt. 105-6, at 3-6; Dkt. 105-7, at 31-32, 120:123-121:12; 48 at 186:18-187:14.)

Courts value the testing of alternative designs to form the basis of opinions offered about them in product defect cases.  *See Bielskis*, 663 F.3d at 895; *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001); *Bourelle v. Crown Equipment Corp.*, 220 F.3d 532, 535-36 (7th Cir. 2000) (citing *Cummins v. Lyle Indust.,* 93 F.3d 362, 368-70 (7th Cir. 1996)); *see e.g.*, *Hasan*, 2014 WL 4124254 at *3.  However, it does not follow that the law therefore requires testing.  "Hands-on testing of an alternative design offered by an expert is not an absolute prerequisite to the admission of expert testimony that a design is defective in a products liability

action." *Dhillon*, 269 F.3d at 865. Testing a theory provides but one measure of its reliability. *See e.g.*, *Hasan,* 2014 WL 4124254 at *10.

More accurately, *Daubert* looks to whether the theory has been or *can* be tested.[6] 509 U.S. at 593. Rule 702 seeks to ensure that expert witnesses use the intellectual rigor required in their professional work. *Cummins,* 93 F.3d at 369 (citations omitted). This can be accomplished a number of ways, including personal experiments or observations. *Id.* (citing *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 n.6 (7th Cir. 1993); *see e.g.*, *Hasan,* 2014 WL 4124254 at *4; *Lott*, 2013 WL 3728581 at *20. *Cf. Winters v. Fru-Con Inc.*, 498 F.3d 734, 742-43 (7th Cir. 2007) (affirming court's exclusion of expert witnesses where they failed to test and "failed to utilize any other method of research to compensate for their lack of alternative testing," such as "making proper personal observations"). For example, the *Hasan* court admitted the expert to opine on: the unreasonable danger incurred by inadequate fall protection mechanisms on the Cottrell rig at issue, which could have included "handholds, catwalks, friction increasing material, and/or flexible safety netting"; the foreseeability of injury; and the feasibility of the alternative design. *See e.g.*, *Hasan*, 2014 WL 4124254 at *1-2, 5 (internal quotations omitted). There, the expert based his opinions on a review of photos, patents, and discussions about the alternative design without testing or personal observing the alternative design. *See e.g.*, *id.* at *1-2, 5 (internal quotations omitted). The reliability of his method sufficed relative to the simplicity of the design challenged and additional safety features proposed. *See e.g.*, *id.* at *4-5.

Much like in *Hasan*, the plaintiffs here seek to admit Gernon's opinions that the Cottrell rig in question provided unreasonably dangerous inadequate fall protection mechanisms in spots where the design could have included a catwalk, grab-bars, interconnecting cables, a moving

---

[6] In the absence of testing, courts can also weigh whether a theory has been subject to peer review and publication, whether it has a known or potential rate of error, and the extent to which the relevant scientific community accepts the theory. *Daubert*, 269 F.3d at 593-94.

safety platform, and a moveable safety platform. (*See* Dkt. 105-6, at 3-6.) *See e.g.*, *Hasan*, 2014 WL 4124254 at *1-2, 5 (internal quotations omitted). Like the expert in *Hasan* – also a mechanical engineer – Gernon has not per se tested the alternative design but has formed his opinions through reviewing photographs and patents of these designs, as well as photographs of the rig in question. (*See* Dkt. 105-6, at 3-9.) *See e.g.*, *id.* at *1-2, 5 (internal quotations omitted); *Lott*, 2013 WL 3728581 at *8, 20 (expert permissibly analyzed alternative design with deposition transcripts, exhibits, and photographs, without testing). Gernon took even further steps, including observing the moveable safety platform design in person and reviewing witness depositions. (*See* Dkt. 105-6, at 3-9.)

Testing alternative designs strengthens the reliability of an expert's opinions, but the Court questions the utility of doing so here relative to the inevitable expense. Gernon's opinions do not point to novel safety features whose approximate costs and benefits remain unknown to the Defendants. Instead, Gernon opines that Cottrell should have been more generous and strategic with fall protection safety mechanisms similar to those that the company already has in place on the rig, which were presumably the product of reliable principles and methods before they were installed. (*See* Dkt. 105-6, at 3-9.) *See e.g.*, *Lott*, 2013 WL 3728581 at *8, 20 (alternative design expert opinion admissible without testing where design was otherwise available and not new). Even Sure Footing moveable safety platforms, which have yet to be formally tested but have been installed on some trucks, feature enhanced designs of safety mechanisms akin to the catwalks that Cottrell already has installed on the upper decks of its rigs. (*See* Dkt. 105-8, at 6, 15:14-16:19; at 7, 21:9-19, at 12, 41:6-17.) The Court also questions the practicality. Requiring physical testing for alternative designs before an expert can opine on them could create such a substantial upfront expense that such evidence would prove "cost

prohibitive for the vast majority of plaintiffs." *See e.g.*, *Traharne v. Wayne/Scott Fetzer Co.*, 156 F.Supp.2d 697, 712-13 (N.D.Ill. 2001), *aff'd* 156 F.Supp.2d 717 (N.D.Ill. 2001).

Regardless of whether an expert conducts testing, in a defective design case, an expert opining about alternatives must look to a combination of factors to determine the appropriateness of that design, including its compatibility with the existing product and the comparative installation and maintenance costs. *See Dhillon*, 269 F.3d at 869 (citing to *Cummins*, 93 F.3d at 369). Gernon observed that the second edition of the movable safety platform fit the rig at the Sure Footing facilities.[7]  (*See* Dkt. 109, ¶ 18.)  Although he did not have access to a figure estimating the cost of the updated version, he contemplated the cost of the first version, which its creator estimated to be about $3,000 per side.  (Dkt. 107, ¶¶ 31-33; Dkt. 109, ¶ 19; Dkt. 105-8, at 9, 27:11-22; Dkt. 105-7, at 27, 104:12-15.)  Gernon similarly did not have a figure to ballpark the maintenance costs, but projected that they would be minimal. (Dkt. 107, ¶¶ 31-33; Dkt. 105-7, at 27, 103:15-104:21.)  Even if the clarity of Gernon's analysis leaves something to be desired, such weakness affects the weight of his testimony, not its admissibility. *See NutraSweet Co. v. X-L Engineering, Co.*, 227 F.3d 776, 789 (7th Cir. 2000); *see e.g.*, *Hasan*, 2014 WL 4124254 at *5; *Traharne*, 156 F.Supp.2d at 713 (leaving trier of fact to determine credibility of electrical engineer expert who predicated opinions on generally accepted design principles and expertise).

Accordingly, Gernon approaches his theories with an intellectual rigor like others in his field, even without testing the designs about which he opines. *See Daubert*, 509 U.S. at 593; *Cummins,* 93 F.3d at 369 (citations omitted); *Tuf Racing Prods., Inc.,* 223 F.3d at 591; *see e.g.*, *Hasan,* 2014 WL 4124254 at *4; *Lott*, 2013 WL 3728581 at *20.  *Cf. Winters*, 498 F.3d at 742-43.  Particularly in light of his background, the relative simplicity of the safety features in

---

[7] Plaintiff's witness Chris Hanks testified that he could not fit version one onto a Cottrell rig.  (Dkt. 105-8, at 11, 35:14-36:1.)

question, and his consideration of the facts available to him through personal observation, photographs, patents, depositions, and other documents, the Court finds Gernon's proffered opinions sufficiently reliable for admission. *See e.g.*, *Hasan*, 2014 WL 4124254 at *4-5; *Lott*, 2013 WL 3728581 at *8, 20.

### 3. Helpfulness to the Trier of Fact

Because the Court finds Gernon qualified and his opinions sufficiently reliable, it must assess whether the expert's proposed testimony will assist the trier of fact in understanding the evidence or determining a factual issue. *See* Fed. R. Evid. 702; *Myers,* 629 F.3d at 644 (citing *Ervin,* 492 F.3d at 904); *see also Ortiz,* 656 F.3d at 526. The Rule's basic standard of relevance is "liberal," including evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probably than it would be without the evidence." *Daubert*, 509 U.S. at 587 (citing Fed. R. Evid. 401).

The Defendant only argues that Gernon's testimony is not relevant because he cannot establish that the design of the Cottrell rig likely caused the incident as opposed to a "series of intervening intentional misuse and events." (Dkt. 98, at 10.) Cottrell relies on *Rodriguez*, where the court did not hold a handgun manufacturer liable for a product defect because the court found that a fight, not the gun's defect, had proximately caused the plaintiff's injuries. *See e.g.*, *Rodriguez v. Glock, Inc.*, 28 F. Supp. 2d 1064, 1070 (N.D. Ill. 1998). Cottrell points to a series of moments leading up to Schuring's injury that, Cottrell argues, intervene and break the chain of causation arising from any defect in Cottrell's rig, including that Schuring did not lower the upper deck into the proper position for unloading, that he failed to inspect for hydraulic fluid, and that he intentionally decided to fall once his foot wedged and he fell upside down. (Dkt. 98, at 11.) However, as discussed below, the parties dispute the facts underlying each of these

moments.  (*See* Dkt. 107, ¶¶ 6, 11, 13, 18-19, 24-25.)  Gernon's opinions on the product defect

and alternative design would help to the Court to understand the purported foreseeability and

unreasonable danger of the design.  *Cf. Rodriguez*, 28 F. Supp. 2d at 1070.  Gernon's testimony

and cross-examination would allow a factfinder to weigh the extent to which the rig's design

could, or could not have been, different, and how this might have changed the outcome of

Schuring's incident.  Such findings factor into causation and thus all of the Schurings' claims

against Cottrell.  *See e.g.*, *id.*; *see also Mikolajczyk v. Ford Motor Co.*, 231 Ill.2d 516, 543 (Ill.

2008) (requiring proximate cause element for strict liability cases in Illinois); *Caterpillar, Inc. v.

Usinor Industeel*, 393 F.Supp.2d 659, 685 (N.D.Ill. 2005) (implying proximate cause element for

implied warranty); *Krywin v. Chicago Transit Authority*, 238 Ill.2d 215, 235 (Ill. 2010)

(requiring proximate cause finding for willful and wanton conduct claim); *Johnson v. May*, 223

Ill. App. 3d 477, 488 (5th Dist. 1992); *Malfeo v. Larson*, 208 Ill. App. 3d 418, 425 (1st Dist.

1990) (loss of consortium claims rely on negligence finding for spouse).  Further, Schuring's

strict product liability claim relies in part on expert opinion in order to establish that the design

was unreasonably dangerous.  *See Show v. Ford Motor Co.*, 659 F.3d 584, 587 (7th Cir. 2011).

Gernon thus offers relevant opinions, and his testimony qualifies him to serve as an expert

witness in this case under *Daubert*.  509 U.S. at 587; *Myers,* 629 F.3d at 644 (citing *Ervin,* 492

F.3d at 904); *see also Ortiz,* 656 F.3d at 526.

**II. Motion for Summary Judgment**

      **A. Legal Standard**

      The Court proceeds to consider Cottrell's Motion for Summary Judgment, which it

argues will succeed even if the Court considers Gernon's testimony.  "The court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is material depends on the underlying substantive law that governs the dispute. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citation omitted). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted). Because the plaintiff bears the ultimate burden of persuasion, the defendant's summary judgment burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). Summary judgment is appropriate where "no reasonable jury could rule in favor of the nonmoving party." *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

### B. Product Defect

Cottrell argues that that it is entitled to summary judgment because Plaintiffs do not conduct a risk-utility test to establish a defect with the Cottrell rig, as required to show strict product liability in Illinois. (Dkt. 95, at 2.) Plaintiffs argue that Cottrell views this analysis too narrowly, saying that they have sufficient evidence to reach a jury under the consumer expectation test, which provides a type of risk-utility test under Illinois product liability law. (Dkt. 104, at 7.) Neither states the law precisely. Rather, the consumer-expectation perspective provides but one factor among many that can be considered within the risk-utility test, and alone can form the basis of proof or theory for a case. *See Show*, 659 F.3d at 585-86; *see e.g.*,

*Mikolajczyk*, 231 Ill.2d at 555-56.  Plaintiffs use the test to demonstrate the unreasonable danger element in a product liability claim.  *See Show*, 659 F.3d at 585-86.  A risk-utility analysis therefore provides a relevant consideration in a strict product liability case, but it is not an element of the claim that the plaintiff must prove.  *See e.g.*, *Mikolajczyk*, 231 Ill.2d 516 at 546.  Beyond consumer expectations, the risk-utility test may consider: the utility to the individual user or public as a whole; the magnitude and probability of foreseeable risks of harm; product instructions and warnings; the range of product choices; whether the design conformed to industry standards and regulations; the availability and feasibility of alternative designs at the time of the product's manufacture; and the likely effects of an alternative design on production costs, longevity, maintenance, and repair.  *See Show*, 659 F.3d at 586-87; *see e.g.*, *Jablonski v. Ford Motor Company*, 2011 IL 110096, ¶ 85 (Ill. 2011); *Mikolajczyk*, 231 Ill.2d at 555-56.

Cottrell predicates its argument on the assertion that Gernon does not conduct any risk-utility analysis, as stated in his deposition and as shown in his expert report.  (*See* Dkt. 95, at 2; Dkt. 105-6; Dkt. 105-7, at 50, 194:18-195:14.)  First, Cottrell overstates Gernon's admission.  Cottrell relies on the below portion of Gernon's deposition:

> Q: Did you conduct any type of risk utility analysis with regard to… the design of the rig that Mr. Schuring was using at the time of his accident?
>
> A: As depicted here.
>
> Q: Correct.
>
> A: No.  In other words, you're – you're not referring to the modifications I suggested.  In other words, you're – you're referring to it as –
>
> Q: As it was the day of this accident.
>
> A: Yeah. And – And as provided to him by the retrofit –
>
> Q: Yeah.

17

A: – From –

Q: As it was the day of the accident.

A: Right. No.

(*Id.*)  Gernon clarified that counsel's question did not refer to Opinions 1-4 of his report on suggested safety mechanisms, but only to the overall design of the rig, which most closely relates to Opinion 5.  (*See* Dkt. 105-6, at 3-6.)  Even then, the question broadly refers to the design of the rig as a whole, whereas Gernon only opines that the design requires multiple trips from ground level to the upper deck in order to comply with the unloading instructions that Cottrell recommends.  (*See id.*, at 6.)  Gernon does not so clearly state, as Cottrell's argument suggests, that he failed to conduct any risk-utility analysis.

What is true, as Cottrell further points out, is that Gernon does not consider several of the above risk-utility factors.  His report does not explicitly account for consumer expectations, product instructions and warnings, or the range of similar available products.  *See Show*, 659 F.3d at 586-87; *see e.g.*, *Jablonski*, 2011 IL 110096 ¶ 85; *Mikolajczyk*, 231 Ill.2d 516 at 555-56.  (*See* Dkt. 105-6, at 3-6.)  Yet, in preparing his report, Gernon certifies that he reviewed materials including all witness depositions, which contained facts relating to other risk-utility factors.  (*See id.*, at 7.)  For instance, as to the magnitude and probability of foreseeable risks, other witness depositions attest to earlier deaths caused falls from other double-decker trucking rigs, including one Cottrell rig.  (*See* Dkt. 105-8, at 6, 15: 7-21; Dkt. 105-4, at 10, 32:14-33:19.)  Similarly, Cottrell points to testimony by Gernon stating that he did not consider the cost of the alternative design that he proposed, nor installation or maintenance costs.  (Dkt. 95, at 3; Dkt. 105-7, at 27, 103:15-104:19; 53, 208:4-10.)  However, other parts of the record report price points that Gernon would have considered within his reported document review.  This includes the estimate from

Howes that Cottrell spent about $300-400 in materials plus labor costs to install the material safety devices that it added to the head ramp in 2009, which could help to estimate what would have been the cost of similar cables and grab-bars. (Dkt. 105-4, at 55:22-56:2; Dkt. 104, at 9.) The record also includes Hanks's testifying that version one of the Sure Footing design would have cost $3,000 per side, even though he could not price version two. (*See* Dkt. 105-8, at 9, 27:11-22.) Gernon had all of the above factors at his disposal to consider, and need not have considered them all explicitly in his report in order for them to have factored into his analysis. *See Show*, 659 F.3d at 586-87; *see e.g.*, *Jablonski*, 2011 IL 110096 ¶ 85; *Mikolajczyk*, 231 Ill.2d 516 at 555. Nor must the risk-utility analysis consider every possible factor. *See Show*, 659 F.3d at 586; *see e.g.*, *Hasan*, 2014 WL 4124254 at *5 (citing *Jablonski*, 2011 IL 110096, ¶¶ 85-86).

Lastly, while the risk-utility analysis does rely on expert opinion as a component needed to establish a complex product's unreasonable dangerousness through a risk-utility approach, the law does not therefore require the expert to shoulder the overall analysis. Rather, that responsibility remains with the plaintiff, who must establish sufficient risk-utility evidence in the record. *See Show*, 659 F.3d at 585-88 (product liability can be established where the "plaintiff" introduces evidence about consumer expectations or product design).[8] As discussed above, the record indeed speaks to elements of the risk-utility analysis even where Gernon does not speak to these directly. Accordingly, summary judgment cannot be granted on these grounds.

### C. Causation

Cottrell also contends that no genuine issue of material fact remains such that Plaintiffs can show causation as a matter of law, given intervening, unforeseeable factors that led to

---

[8] *Show* may even indicate, but does not clearly hold, that the burden of conducting a risk-utility test shifts to the defendant after the plaintiff introduces evidence that shows either the consumer-expectation test or proximate cause. "If the defendant thereafter fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs, the plaintiff will prevail. This test…has come to be known as the risk-utility or risk-benefit test." *Show*, 659 F.3d at 585 (citing *Mikolajczyk*, 231 Ill.2d at 526-27) (internal quotations omitted).

Plaintiffs' injuries. (Dkt. 95, at 4.) Cottrell concedes that Plaintiffs show but-for causation. ("Causation in fact, however, is not the issue here…") (*Id.*, at 6.) But Cottrell contests that Plaintiffs can show proximate cause.[9] Plaintiffs argue that Cottrell should have been able to foresee the chain of events that led to Schuring's fall, however convoluted, because of the rig's design defects.[10] (Dkt. 105, at 6-7.)

To survive summary judgment in a strict product liability or negligence case, a plaintiff must point to relevant, outstanding factual issues that could show with reasonable certainty that the product's defect caused the injury. *See e.g.*, *Stallings v. Black & Decker Corp.*, No. 06 C 4078-JPG, 2008 WL 4530695, at *10 (S.D.Ill. Oct. 7, 2008) (citing *Wintz By and Through Wintz v. Northrop Corp.*, 110 F.3d 508, 515 (7th Cir. 1997)). Proximate cause shows that the plaintiff's injury occurred through a "natural and continuous sequence of events unbroken by any effective intervening cause." *See e.g.*, *Hill v. Brass Eagle, Inc.*, No. 15 C 368, 2016 WL 4505170, at *9 (N.D.Ill. Aug. 29, 2016) (citing *Kleen v. Homak Mgf. Co.*, 321 Ill.App. 3d 639, 641, 749 N.E.2d 26, 29 (2001)). It only becomes a question of law where no material fact issues remain, or "only one conclusion is clearly evident" to a reasonable factfinder. *Id.*; *Rodriguez*, 28 F.Supp.2d at 1070. The question comes down to whether the defendant could foresee the incident. *See e.g.*, *Hill*, 2016 WL 4505170 at *9 (citing *Lee v. Chicago Transit Auth.*, 152 Ill.2d 432, 456, (Ill. 1992)). Proximate cause is "ordinarily a question for the jury." *See e.g.*, *id.* at *9 (quoting *Kleen*, 749 N.E.2d at 29); *Rodriguez*, 28 F.Supp.2d at 1070.

---

[9] In its Motion for Summary Judgment, Cottrell does not specify to which of Plaintiffs' counts this argument applies, (*see* Dkt. 95, at 4-13) but the Court applies this argument to all of Plaintiffs' counts against Cottrell because each relies on proximate cause as an element. *See e.g.*, *Mikolajczyk*, 231 Ill.2d at 543 (required for strict product liability); *Caterpillar, Inc.*, 393 F.Supp.2d at 685 (required for implied warranty); *Krywin*, 238 Ill.2d at 235 (required for willful and wanton conduct); *Johnson*, 223 Ill.App.3d at 488; *Malfeo*, 208 Ill.App.3d at 425 (1st Dist. 1990) (required for spouse's negligence claim in order to show loss of consortium).

[10] Plaintiffs also argue in their Response to Defendants' Motion for Summary Judgment that the misuse that Cottrell points out does not provide an affirmative defense to liability under Illinois law. (Dkt. 104, at 6.) Cottrell concedes as much, and does not assert misuse as an affirmative defense. (Dkt. 110, at 14-15.) The Court therefore considers this argument moot.

Indeed, Cottrell concedes that "the issue of proximate cause is generally one of fact for the jury…" (Dkt. 95, at 7.) Although Cottrell paints the events leading up to Schuring's injury as a veritable Rube Goldberg machine of unexpected cause and effect, enough material facts exist on the record and remain in dispute such that more than one conclusion about causation could be reasonably drawn, thus precluding summary judgment. Cottrell offers one conclusion: that Schuring failed to properly lower the upper deck to unload, to inspect for hydraulic fluid, and to watch his footing, all of which resulted in the extraordinary circumstance of Schuring slipping upside down, after which Schuring intentionally decided to extricate himself by wiggling his lodged right foot free, which led to him falling and injuring himself. (*Id.*, at 4.) In this narrative, Cottrell points to each of Schuring's decisions as unforeseeable and out of Cottrell's control, which would not allow the Plaintiffs to demonstrate proximate cause.

However, the Plaintiffs raise a number of disputed facts that affect whether a reasonable trier of fact could find proximate cause. For example, the parties dispute whether Schuring slipped in hydraulic fluid or another substance (*see* Dkt. 107, ¶ 13; Dkt. 105-7, at 36, 139:4-140:25), which could contribute to a factfinder's understanding about whether or not Cottrell could foresee the incident, depending on whether the fluid was commonly found on the upper decks of trucking rigs and whether the design of the rig accounts for this. They also dispute whether it would have been feasible for Cottrell to add the safety mechanisms in question, particularly before the time of Schuring's fall in September 2011. (*See* Dkt. 109, ¶ 18.) Specifically, Cottrell points to testimony from Hanks about whether or not that technology could have been fitted to the rig used by Schuring before September 2011 because Hanks says the first version would not have fit the rig at issue while the second version did not develop until 2012. (*See id.*; Dkt. 105-8, at 11-15, 35:19-36:1; 52:9-15). However, Hanks also says that Sure

Footing can modify any car hauler to fit the moveable platform system. (*See id.* at 10, 31:14-33:13; at 11, 35:4-12.) Sure Footing had even entered negotiations with Cottrell in June or July of 2011, a couple of months before Schuring's fall, to discuss whether to add the mechanism to Cottrell rigs. (*See id.*, at 11-12, 37:14-41:5.) The answer goes to the feasibility of adding the safety mechanisms in question before Schuring's fall, specifically Sure Footing movable platforms, which a factfinder needs to determine whether a condition existed that led to the fall, and whether the defendant could have foreseen the fall.

Perhaps most critically, the parties dispute whether Schuring "chose" to fall by not lowering the upper deck before unloading, by failing to see the fluid on which he slipped, and finally by dislodging his foot in order to free himself. (*See* Dkt. 107, at ¶¶ 11, 17, 21.) Cottrell points to Schuring's contemplation as evidence of his multiple options through which his choice to free his foot breaks the chain of proximate cause. Plaintiffs, however, did not see his decision as a choice. As Schuring concluded about his thought process, "There was nothing else I could do." (Dkt. 105-2, at 167, 164:5.) Under these circumstances, a factfinder would be best situated to make the call on whether Schuring made a genuine choice that provided a superseding factor that broke any causation resulting from the design of Cottrell's rig.

Each of these disputed facts speaks to the foreseeability of the incident, and thus all are material. Other questions of foreseeability remain, such as whether Schuring knew or should have known about the dangers that drivers encountered while unloading cars from double-decker rigs, especially in light of the fatalities that prompted Cottrell's retrofitting some but not all of the upper deck's positions. (Dkt. 105-8, at 6, 15: 7-21; Dkt. 105-4, at 10-11, 32:14-36:23; Dkt. 107, ¶ 6; Dkt. 109, ¶¶ 1, 3, 5.)

These outstanding findings of fact are needed to decide whether Schuring's fall constitutes a natural and continuous consequence of Cottrell's rig design. *See e.g.*, *Hill*, 2016 WL 4505170, at *9 (internal citation omitted). A reasonable factfinder could conclude a narrative distinct from that put forth by Cottrell. Instead of seeing Schuring's fall as the result of a series of coincidences and bad choices on his part, she could also resolve that Cottrell knew or should have known about the risk that drivers encountered on their upper decks given the earlier incidents and that, regardless, the company decided against retrofitting the rig with safety measures at positions No. 8 and 10 without a sufficient basis in the relative utility, risks, and costs. As Hanks testified, a fall from the upper deck of another rig has occurred before with far graver consequences, so Schuring's circumstances are not necessarily so unusual that a second narrative cannot stand. (*See* Dkt. 105-8, at 6, 15: 7-21.) Because no single "clearly evident" conclusion can be drawn, and material fact issues remain, the Court must allow a jury to make these determinations. *Id.*; *Rodriguez*, 28 F.Supp.2d at 1070. Accordingly, the Court denies Cottrell's Motion for Summary Judgment.

## CONCLUSION

For these reasons, the Court denies Cottrell's Motion to Bar Plaintiffs' Expert [97] and denies its Motion for Summary Judgment [94] against the Schurings for Counts I-IV and XIII of their Complaint.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: _3/27/2017____